2007 ND 50

**In the Matter of Jamal Joel ANDERSON**

**State of North Dakota, Petitioner and Appellee,**

v.

**Jamal Joel Anderson, Respondent and Appellant.**

**No. 20060088.**

Supreme Court of North Dakota.

April 10, 2007.

Fritz R. Fremgen, State's Attorney, Jamestown, N.D., for petitioner and appellee.

Thomas E. Merrick, Jamestown, N.D., for respondent and appellant.

Robert P. Bennett, Assistant Attorney General, Office of Attorney General, Bismarck, N.D., amicus curiae, submitted on brief.

SANDSTROM, Justice.

[¶ 1] Jamal Anderson appeals from a district court judgment ordering his involuntary commitment to the care and custody of the executive director of the Department of Human Services as a sexually dangerous individual. Concluding that good cause existed for delaying the commitment hearing, that no right to a jury trial exists in these proceedings, and that clear and convincing evidence exists to prove Anderson is a sexually dangerous individual, we affirm.

## I

[¶ 2] On September 21, 2005, while Anderson was in the North Dakota State Penitentiary and about to complete his five-year sentence for drug-related convictions, the State petitioned for his commitment as a sexually dangerous individual. Anderson's anticipated release date from prison was October 23, 2005.

[¶ 3] In 1998, Anderson was charged with gross sexual imposition; however, he was convicted of sexual assault as the result of a plea agreement. This charge resulted from Anderson, then 17 years old, having "at least offensive sexual contact with a female who was 15 years old at the time, if not sexual intercourse accomplished by threat or force." In 2000, Anderson was convicted of corrupting a minor for having sex with a 16–year–old female when he was 20 years old.

[¶ 4] On October 4, 2005, the district court found probable cause for the commitment of Anderson as a sexually dangerous individual and ordered a psychological evaluation of him. The district court scheduled the commitment hearing for November 7, 2005. On November 3, 2005, the State moved for a continuance because of "case load at the particular unit conducting these examinations.... Petitioner requests the commitment proceeding be rescheduled to a date after the 2nd of December 2005." The district court continued the commitment hearing to December 21, 2005.

[¶ 5] On December 6, 2005, Anderson moved to dismiss the commitment petition. He contended that the 60–day statutory period that begins after the finding of probable cause had run. The district court denied his motion. Psychologists at the North Dakota State Hospital submitted their evaluations on December 19, 2005. On December 20, 2005, Anderson moved for a continuance to obtain an independent evaluation and prepare for the commitment hearing. The district court granted the motion for the continuance and rescheduled the commitment hearing to February 8, 2006. Anderson hired Dr. Robert Gulkin, a clinical psychologist, to conduct the independent evaluation. He filed his report on January 31, 2006. At the close of the commitment hearing, the district court found Anderson to be a sexually dangerous individual and committed him to the care and custody of the executive director of the Department of Human Services. There he would receive inpatient sex offender treatment for an indefinite term. Anderson appeals.

[¶ 6] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 25–03.3–02. Anderson's appeal is timely under N.D.C.C. § 25–03.3–19. This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 25–03.3–19.

## II

[¶ 7] Anderson argues that the State's petition for commitment should have been dismissed for an excessive delay between the finding of probable cause and the commitment hearing.

[¶ 8] Section 25–03.3–13, N.D.C.C., provides, in part: "Within sixty days after the finding of probable cause, the court shall conduct a commitment proceeding to determine whether the respondent is a sexually dangerous individual. The court may extend the time for good cause."

[¶ 9] About a month after the district court found probable cause for Anderson's commitment, the State notified Anderson's former counsel by e-mail that a continuance would be required because the State Hospital could not complete the psychiatric evaluation in time for the commitment hearing. Anderson's former counsel re-

plied that he would not oppose the motion. On November 3, 2005, the State filed a request for a continuance on that ground. On November 4, 2005, the district court granted the motion and rescheduled the date of the commitment hearing to December 21, 2005—78 days after the finding of probable cause, or 18 days beyond the statutory deadline, without objection from Anderson at that time. On December 6, 2005, Anderson's counsel moved to dismiss the commitment petition, claiming that Anderson had been incarcerated for over 60 days in violation of section 25–03.3–13, N.D.C.C. In response to his motion to dismiss, the State presented an affidavit from the State Hospital regarding its plan for evaluating Anderson:

> Dr. Joseph Belanger has completed three interviews with Jamal this week (5–9 December 2005), and plans to complete the [fourth interview] on the 9th of December 2005.

> Dr. Rosalie Etherington's interviews of Mr. Anderson are planned for this coming week (12–16 December 2005).

> It is anticipated that the report for Mr. Jamal Anderson's review will be completed and delivered to the parties and filed with the Court by Friday the 16th of December 2005.

> Prior to the doctors interviewing Mr. Anderson, Dr. Etherington and support staff constructed a database of the documents. That database was reviewed by the doctors to prepare for their interviews of Mr. Jamal Anderson. Along with that, extensive review of the past history documents has been completed by both Dr. Etherington and Dr. Belanger. Dr. Belanger has further independently competed a second supplementary database after independent review of the document set.

The district court denied Anderson's motion for dismissal, finding that "[r]eason-able attempts have been made by the State to secure an evaluation."

[¶ 10] After receiving the two State Hospital evaluations on December 19, 2005, Anderson found them to be "not advantageous" to him, and he moved for a continuance to obtain an independent evaluation. In his motion, Anderson stated that he "*now* has the opportunity to have an independent evaluation"; however, Anderson could have requested such an evaluation as early as September 2005, when the State petitioned for his commitment and notified him of his rights in these proceedings. By waiting until December 20, 2005—the day before the commitment hearing—to request an independent evaluation, Anderson added another 57 days to his detention. The commitment hearing was held on February 8 and 15, 2006.

[¶ 11] "The evaluation was completed and the case was ready to proceed to a hearing within the first extension when [Anderson] requested an independent evaluation and concomitant extension of time. The court granted [Anderson]'s request. [Anderson] cannot now complain about the delay *occasioned by his own request for an independent evaluation.*" *See In re M.D.*, 1999 ND 160, ¶¶ 17, 18, 598 N.W.2d 799 (allowing a six-month delay between the finding of probable cause and the commitment hearing). Absent Anderson's motion for a continuance to obtain an independent evaluation, the commitment hearing would have been delayed only 18 days beyond the statutory deadline. Like M.D., Anderson caused the bulk of the delay. Furthermore, by not opposing the State's motion for a continuance, Anderson's former counsel essentially eliminated the need for a hearing on the matter of good cause for the extension. Nonetheless, the district court issued a ruling that followed our line of cases delimiting the boundaries of such extensions.

[¶ 12] The district court did not err in finding good cause for the extension.

### III

■ [¶ 13] Anderson argues, for the first time on appeal, that he was denied his right to a trial by jury. Anderson asks for reversal of the judgment of commitment as a matter of law.

■ [¶ 14] "Any party may demand a trial by jury of any issue *triable of right* by jury...." N.D.R.Civ.P. 38(b) (emphasis added). "The failure of a party to serve and file a demand as required by this rule constitutes a waiver by the party of trial by jury." N.D.R.Civ.P. 38(e). "[N]otwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of *right*, the court in its discretion upon motion may order a trial by a jury of any or all issues." N.D.R.Civ.P. 39(b) (emphasis added). "Of course, the opposite is true with regard to waiver of the right to a jury trial in criminal proceedings; we never imply waiver in a criminal case." *First Western Bank of Minot v. Wickman*, 500 N.W.2d 896, 898 n. 4 (N.D.1993) ("Under Rule 23, N.D.R.Crim.P., a defendant is guaranteed a jury trial without saying a word. The right is so important in a criminal context that the defendant need not demand it.").

[¶ 15] "The legislature has clearly expressed its intent to create a civil, rather than criminal, procedure in N.D.C.C. ch. 25–03.3." *In re M.D.*, 1999 ND 160, ¶ 27, 598 N.W.2d 799. For the civil commitment proceedings under this chapter, the legislature specifically excluded the right to a jury trial. *See* N.D.C.C. § 25–03.3–13 ("Any proceeding pursuant to this chapter must be tried to the court and not a jury.").

[¶ 16] Article I, section 13, of the Constitution of the State of North Dakota provides:

The right of trial by jury shall be secured to all, and remain inviolate. A person accused of a crime for which he may be confined for a period of more than one year has the right of trial by a jury of twelve. The legislative assembly may determine the size of the jury for all other cases, provided that the jury consists of at least six members. All verdicts must be unanimous.

It is well-established, however, that:

[t]his provision of our constitution that right of trial by jury shall remain inviolate neither enlarges nor restricts that right but merely preserves it as it existed at the time of the adoption of our constitution. *In re R.Y.*, 189 N.W.2d 644, 651 (N.D.1971). It preserves the right of trial by jury for all cases in which it could have been demanded as a matter of right at common law. *Id.*

*Peters–Riemers v. Riemers*, 2002 ND 72, ¶ 5, 644 N.W.2d 197; *accord Daley v. American Family Mut. Ins. Co.*, 355 N.W.2d 812, 814–15 (N.D.1984); *City of Bismarck v. Altevogt*, 353 N.W.2d 760, 764 (N.D.1984); *Union State Bank v. Miller*, 335 N.W.2d 807, 808 (N.D.1983). Therefore, whether our state constitution provides the right to a jury trial for persons subject to commitment proceedings depends on whether a statutory right to jury trial in this context existed at the time our constitution was adopted. *See Interest of R.Z.*, 415 N.W.2d 486, 488 n. 1 (N.D.1987) (holding that R.Z. had no constitutional right to jury trial under article I, § 13, for proceedings under N.D.C.C. ch. 25–03.1, which governs commitment of the mentally ill or chemically dependent). "The sexually dangerous individual commitment provisions have been placed in Title 25 of the Century Code, entitled 'Mental and Physical Illness or Disability.' The provisions are close in proximity and content to the

provisions for civil commitment of the mentally ill or chemically dependent, contained in N.D.C.C. ch. 25–03.1." *In re M.D.*, 1999 ND 160, ¶ 27, 598 N.W.2d 799.

[¶ 17] Anderson contends that the right to a jury in these proceedings existed at the time of the adoption of our state constitution in 1889, because persons of unsound mind, defined as "idiots, lunatics, and imbeciles" in the territorial laws of 1887 could "appeal to the district court and demand therein an investigation before a jury."

[¶ 18] The Laws of the Dakota Territory reflect that the "jury" contemplated at that time was not a jury of one's peers, but a panel of experts convened solely to review the probate judge's commitment order. *See* 1877 Compiled Laws of the Territory of Dakota, Civil Code § 2655(3) ("After the order is granted the person alleged to be of unsound mind ... may appeal to the district court and demand therein investigation before a jury, which must be substantially, in all respects, conducted as under an inquisition of lunacy."). In an "inquisition of lunacy," as cross-referenced in section 2655(3) to article 2, chapter 22, of the political code, a commission of three persons, including the probate judge, a physician, and an attorney, reviews the commitment order. 1877 Compiled Laws of the Territory of Dakota, Political Code §§ 2179, 2193.

[¶ 19] The involuntary civil commitment provisions of N.D.C.C. ch. 25–03.3 create a statutory proceeding that was unknown at the time our constitution was adopted in 1889. Consequently, there is no right under article I, § 13, to a jury trial in proceedings under this chapter.

## IV

[¶ 20] Anderson argues that the State failed in its burden to prove by clear and convincing evidence that he is a sexually dangerous individual.

[¶ 21] We apply a "modified clearly erroneous" standard of review for appeals from civil commitments of sexually dangerous individuals under N.D.C.C. ch. 25–03.3. *In re J.M.*, 2006 ND 96, ¶ 11, 713 N.W.2d 518. "We will affirm a district court's commitment order unless the order is induced by an erroneous view of the law, or we are firmly convinced the order is not supported by clear and convincing evidence." *In re G.R.H.*, 2006 ND 56, ¶ 8, 711 N.W.2d 587.

[¶ 22] Chapter 25–03.3, N.D.C.C., authorizes the involuntary civil commitment of a person found to be a "sexually dangerous individual." Section 25–03.3–01(8), N.D.C.C., which defines that term, provides a three-part test:

(1) the individual has engaged in sexually predatory conduct;

(2) the individual has a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction; and

(3) the disorder makes the individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others.

*In re G.R.H.*, 2006 ND 56, ¶ 6, 711 N.W.2d 587. Furthermore:

we construe the definition of a sexually dangerous individual to mean that proof of a nexus between the requisite disorder and dangerousness encompasses proof that the disorder involves serious difficulty in controlling behavior and suffices to distinguish a dangerous sexual offender whose disorder subjects him to civil commitment from the dangerous but typical recidivist in the ordinary criminal case.

*Id.* at ¶ 18; *accord Kansas v. Crane,* 534 U.S. 407, 413, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002) (reviewing what constitutes a "sexually violent predator" under the Kansas Sexually Violent Predator Act).

### A

[¶ 23] The first element for commitment is that the individual has engaged in sexually predatory conduct. N.D.C.C. § 25–03.3–01(8); *In re G.R.H.,* 2006 ND 56, ¶ 6, 711 N.W.2d 587.

[¶ 24] Section 25–03.3–01(9), N.D.C.C., defines "sexually predatory conduct," in part, as:

a. Engaging or attempting to engage in a sexual act or sexual contact with another individual, or causing or attempting to cause another individual to engage in a sexual act or sexual contact, if:

(1) The victim is compelled to submit by force or by threat of imminent death, serious bodily injury, or kidnapping directed toward the victim or any human being, or the victim is compelled to submit by any threat that would render an individual of reasonable firmness incapable of resisting;

. . . .

(7) The victim is a minor and the actor is an adult; or

b. Engaging in or attempting to engage in sexual contact with another individual or causing or attempting to cause another individual to have sexual contact, if:

(1) The actor knows or should have known that the contact is offensive to the victim . . . .

N.D.C.C. § 25–03.3–01(9)(a)(1), (7) and (b)(1).

[¶ 25] According to the State's petition for commitment, Anderson's 1998 class B misdemeanor sexual assault conviction resulted from Anderson, then 17 years old, having "at least offensive sexual contact . . . accomplished by threat or force" with a 15–year–old female. Anderson was charged with gross sexual imposition, but pled guilty to the reduced charge of sexual assault—despite his contention that the girl initiated the acts and consented throughout.

[¶ 26] Two police officers who were conducting surveillance of the hotel room as part of a drug investigation of Anderson in 1998 testified at the commitment hearing and corroborated the State's use of the phrase "by threat or force" to describe Anderson's conduct. The record contains a transcript of the 1998 interview with Anderson's victim and reveals that Anderson and another male forced her to have oral sex and intercourse. The victim was locked in a bathroom, the light was shut off, her clothes were ripped off, and she was found by police outside the hotel room crying. She also had scratches on her back and abdomen. She told police that the two males took turns abusing her and that it lasted 15 to 30 minutes. She also told the interviewing officer that she "kept on begging them to let me out" and said "no" to Anderson and the other male 15 or 20 times, slapped them, and pushed them in an effort to stop the abuse. Anderson testified that he tried to penetrate her anally. He also testified the girl initiated the acts and consented to them. One of the investigating officers testified that the once playful mood changed once the activity moved to the bathroom:

While we were in the room we did hear, it sounded to us like it was kind of people wrestling around, playing, wrestling around. There was some giggling and talking and at one point we actually heard one of the females say, Jamal, help me. If you help me I'll suck your

dick. And there was a response from a male's voice and then the female responded I'll suck your dick for an hour. This is what I heard through the wall. There's some more conversation for a short time that was unintelligible to me. What I did then, a short time later the female said not here, in the bathroom, and at that point we heard several individuals who we thought three at the time enter into what we thought was the bathroom and the door close. From that point we actually moved into the bathroom of our motel room that we were in. It seemed as the bathrooms in the motel rooms were just opposite each other, again sharing an inner wall. While the individuals were in there we heard the female say—actually saying one of the individual's first names and then *she stated no, no, I don't want to do this.* I don't want to be like this anymore. During some of this conversation that *I could hear she said no, no, several times.* And then she also at one point I heard her make a statement, *no, not my pants, I don't want to do this.* And then at some point around that time *I personally actually heard something bump up against the wall,* whether it was a person or somebody hitting the wall, I don't know, but there was a bump up against the wall. It was shortly after that that myself and the Officer Haug heard what we thought were people exiting the bathroom.

(Emphasis added.) The district court noted in its findings of fact that both Dr. Rosalie Etherington, a clinical psychologist at the State Hospital, and Dr. Joseph Belanger, a licensed clinical and forensic psychologist, found Anderson's denial that force was used in the 1998 incident "incredible." Although the conviction in 2000 for corrupting a minor did not figure greatly into the psychological evaluations, both doctors noted its significance, because Anderson was an adult, age 20, and his victim was a 16–year–old minor. This act satisfies the definition of sexually predatory conduct. *See* N.D.C.C. § 25–03.3–01(9)(a)(7).

[¶ 27] The record supports, by clear and convincing evidence, the district court's finding that Anderson has engaged in sexually predatory conduct. Anderson used force or caused or attempted to cause another individual to engage in a sexual act by locking the bathroom door, turning off the bathroom light, and taking turns holding the victim and abusing her sexually with help of another. Anderson knew or should have known that his contact was offensive to the victim, because she repeatedly said no to his advances, begged to leave the locked bathroom, and fought with Anderson to stop the abuse. Only the plea agreement reduced the charge from gross sexual imposition to sexual assault. The conduct, described in detail by the victim and partially observed by two police officers, remains. About two years after this incident, Anderson was discovered in bed with a sixteen-year-old girl when he was an adult. As Dr. Belanger noted, "The law makes no allowance for parental knowledge or cooperation of the minor. There are therefore two predecessory acts." The district court's finding that this element was met by clear and convincing evidence was not clearly erroneous.

### B

[¶ 28] The second element for commitment is that the individual must have "a congenital or acquired condition that is manifested by a sexual disorder, a personality disorder, or other mental disorder or dysfunction." N.D.C.C. § 25–03.3–01(8); *In re G.R.H.,* 2006 ND 56, ¶ 6, 711 N.W.2d 587.

[¶ 29] The district court found from the evaluations of all three experts that

Anderson does not suffer from paraphilia, that is, a sexual disorder, but does have a severe antisocial personality disorder. At the commitment hearing, Dr. Belanger explained antisocial personality disorder:

> The principal underlying idea is that some individuals have deficit or abnormality in the way the brain and the mind functions such that they are prone proportionally to the pursuit of their own interests and aims in life regardless of the callous impact of these on other people.

Dr. Belanger explained in his written report that "[t]he essential feature of Antisocial Personality Disorder is a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." Dr. Belanger further explained that "the respondent must be positive on at least three out of seven ways this [A] criterion set can be manifested. There are then three additional criterion sets [B, C, and D] to be met." The district court noted that all three evaluators found Anderson satisfied six of the seven "A criterion" that form part of the antisocial personality disorder diagnosis—the missing feature was "[r]eckless disregard for safety of self or others." In his written report and at the commitment hearing, Dr. Belanger explained the "A criterion" and their application to Anderson:

> A.1.) Failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest.... Undersigned counts 22 convictions on various criminal charges between [the date he turned 15] and his last sentencing date of February 2, 2001. Respondent has been incarcerated since. Item is met.
>
> A.2.) Deceitfulness—Mr. Anderson provides an alternative explanation for the events [of the 1998 sex acts].... There is also the datum that respondent says he was a dealer in illegal psychoactive substances and made $100,000 in a year. If this statement is true, then it follows that he must have successfully engaged in many deceits. If this statement is false, then if follows that the statement itself is a deceit. There are multiple other illustrations. Item is met.
>
> A.3.) Impulsivity or failure to plan ahead—respondent says that most of his *fights are impulsive.* Great detail from the police investigation that is a precursor to the 3–23–99 conviction for aggravated assault was made available. This supports Mr. Anderson's claim that he is *impulsive when it comes to fighting. Respondent also failed to follow through with conditions of probation such as register as a sex offender,* which given his familiarity with the legal system, is failure to plan ahead. *He seems to have followed through on none of the recommendations given to him on 5–24–99 for day treatment ....* Item is met.
>
> A.4.) Irritability and aggressiveness— Mr. Anderson has nine disciplinary write-ups that are not for assault and in which there is a definite mention made of irritability.... Item is met.
>
> A.5.) Reckless disregard for safety of self or others—it can be construed that to sell stimulant drugs is to show reckless disregard for the safety of others, but others would argue that the disregard for safety of others must be of a much more imminent risk such as reckless driving. Jamal has a history of partaking in dangerous sports, but this is subthreshold. *Undersigned only scores an item as met if the evidence for it exceeds "a reasonable degree of professional certainty." By this threshold, item is not met although there may be reasonable professional difference about this.*

A.6.) Consistent irresponsibility as evidenced by repeated failure to work consistently or honor financial obligations—It is repeatedly evidenced that Mr. Anderson has not worked and/or has rapidly become bored with work he obtained and quit. Item is met.

A.7.) Lack of remorse—there really is no strong evidence for remorse. Item is met.

(Emphasis added.) Dr. Belanger concluded that the remaining "B, C, and D criterion" were satisfied in Anderson's case: Anderson was at least age 18 when diagnosed with the antisocial personality disorder; there was evidence of Conduct Disorder before age 15, because Anderson was convicted of shoplifting at age 9 or 10; and "no one has ever thought that Mr. Anderson has had either schizophrenia or mania."

[¶ 30] Dr. Etherington, like Dr. Belanger, found six of the seven antisocial personality disorder factors present for Anderson. At the commitment hearing, she discussed her reliance on reports of his pattern of criminal behavior to diagnose Anderson with an antisocial personality disorder:

from Mr. Anderson's case every time he is out he is committing crimes and my look of this is it has not stopped, it has not decreased. Then, additionally, his *behavior in the prison* there were several things that he would have done in there that would have been chargeable offenses. For instance, the most recent of which *in 2005 was an assault against another inmate.* ... I would consider that also diagnostic in failing to conform with social norms, that's the pattern, starting at age 10 continuously through now.

(Emphasis added.) In her written report, she noted that he "received over 50 write-ups while in prison most in relation to impulsive acts."

[¶ 31] Dr. Gulkin conducted the independent evaluation of Anderson and also found no evidence of a sexual disorder. He concurred that Anderson has a significant antisocial personality disorder:

Based upon history, *clinical interview* and the current testing, it is the impression of the undersigned that Mr. Anderson is reasonably diagnosed as showing a personality disorder with *significant anti-social components.* Mr. Anderson's history is positive for a wide range of criminal activities going back to an early age. Aggression, property crimes and alcohol/drug offenses are found in a pattern of blatantly non-conforming behavior .... *pronounced antisocial features* are found in his clinical profile ....

*Based upon historical information and the current assessment, the undersigned finds that Mr. Anderson is an individual who meets the criterion for designation as a Sexually Dangerous Individual.* ...

....

Mr. Anderson does not show a diagnosable sexual pathology but his history is positive for two incidents of predatory sexual behavior that resulted in legal consequences.... *It appears that Mr. Anderson had a variety of sexual partners at the time of both charged incidents, reflecting issues of impulsivity and poor judgment. By his own admission, behavioral control problems were present in the past even when he was sober* .... While Mr. Anderson does not appear to have actively groomed/targeted under aged females, his general *sexual adjustment is problematic and his poor judgment/impulse control puts him at risk for further acts of sexually pred-*

atory behavior in unsupervised situations. ...

... Mr. Anderson's potential for *poorly controlled sexual behavior* would suggest that a community placement with outpatient counseling, a tracker, etc. provides inadequate supervision at this time.

(Emphasis added.) All three experts concurred in the diagnosis of Anderson. All three experts found Anderson to have a "severe" or "significant" antisocial personality disorder. The district court's finding of an antisocial personality disorder is supported by clear and convincing evidence. Although the component of "reckless disregard for safety of self or others" was not found, all three experts noted that only three of the seven factors need to be satisfied to form a diagnosis. The force Anderson used in the 1998 sex acts and his relationship with a minor in 2000 when he was an adult are legally significant. The "reckless disregard" factor also contemplates "sexual behavior or substance abuse that has a high risk for harmful consequences" and "neglect or fail[ure] to care for a child in a way that puts the child in danger." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 702 (rev. 4th ed. 2000) (DSM–IV–TR); American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 646 (4th ed. 1994) (DSM–IV). The 1998 police interview revealed that Anderson's victim was caring for her child in the motel room where she was sexually assaulted and where Anderson and others were likely using alcohol and possibly marijuana. Dr. Belanger also noted Anderson's assault on a fellow inmate as recently as 2005—not to mention the doctor's conclusion that "most of his fights are impulsive." The district court's finding that this element was met by clear and convincing evidence was not clearly erroneous.

C

[¶ 32] The third element required for commitment is that "the disorder makes the individual likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others." N.D.C.C. § 25–03.3–01(8); *In re G.R.H.,* 2006 ND 56, ¶ 6, 711 N.W.2d 587.

[¶ 33] "[P]roof of a nexus between the requisite disorder and dangerousness encompasses proof that the disorder involves serious difficulty in controlling behavior and suffices to distinguish a dangerous sexual offender whose disorder subjects him to civil commitment from the dangerous but typical recidivist in the ordinary criminal case." *Id.* at ¶ 18.

[¶ 34] Dr. Belanger concluded:

In this case the disorder is logically consistent with there being a *causative connection* between a requisite mental condition and subsequent recidivist sexually predatory conduct. . . . [O]ne must note that there are two convictions for criminal conduct that meets one or another definitional standard for sexually predatory conduct. . . .

. . . .

Since there are predecessory acts and since the core feature of antisocial personality disorder is the *callous and remorseless use of others,* it follows that *there is a probability that the personality disorder will lead to recidivist acts of sexually predatory conduct.* The remainder of the assessment addresses whether it can be testified to either a reasonable degree of professional certainty or to a reasonable degree of scientific certainty that the probability is such that it can be concluded that *the personality disorder makes the respon-*

*dent likely to engage in recidivist sexually predatory conduct.*

(Emphasis added.)

[¶ 35] Psychometric "risk assessment inventories" or RAIs were also used to determine the probability or actuarial risk that Anderson will engage in future sexually predatory conduct: (1) the Rapid Risk Assessment for Sexual Offender Recidivism ("RRASOR"); (2) the Static–99; and (3) the Minnesota Sex Offender Screening Tool–Revised ("MnSOST–R"). A fourth test, the Psychopathy Checklist–Revised ("PCL–R 2nd"), is a tool "to measure the degree of psychopathy present." Dr. Etherington concluded that Anderson's PCL–R 2nd score indicated that his antisocial personality disorder was more severe than the general prison population's.

[¶ 36] Dr. Belanger concluded:

Mr. Anderson has a *severe* antisocial personality disorder. He has a conviction history that includes GSI [gross sexual imposition] and corruption of a minor. He has a high MnSOST–R and a high PCL–R 2nd score. *These four items of data* support the opinion to a reasonable degree of professional certainty that respondent has a personality disorder that *renders him likely to engage in additional acts of sexually predatory conduct.*

(Emphasis added.) Dr. Etherington arrived at a similar conclusion and stressed Anderson's failure to complete sex offender treatment:

Mr. Anderson meets the diagnostic criteria for Antisocial Personality Disorder. This disorder creates initial reason to believe *he is likely to engage in further acts of sexually predatory conduct. The actuarial instruments lend additional support to further acts of sexually predatory conduct.* He has not completed a treatment program that might be a protective factor. There is no idiosyncratic

factor that might serve as a protective factor. This *combination* allows the undersigned to conclude to a reasonable degree of professional or scientific certainty that *Mr. Anderson is an individual with a congenital or acquired condition that makes him likely to engage in future acts of sexually predatory conduct.*

(Emphasis added.) Dr. Gulkin concurred: "One of the most potent factors which mediate against re-offense is the successful completion of a Sex Offender Treatment Program. Mr. Anderson has not completed such a program and had apparently been removed ... due to failure to cooperate." With respect to the actuarial testing, Dr. Gulkin reviewed the results of the State Hospital's testing and found that "the administration/scoring of the RAI evaluations at the State Hospital supports the findings and conclusions."

1

[¶ 37] Under the RRASOR, Anderson's score demonstrated "his lack of a specific paraphilic diagnosis." In other words, he does not have a sexual disorder according to all three experts. Consequently, his score of "2" on a scale of 0–6 indicates "about a 14.2% likelihood for being reconvicted for a new sexual offense within 5 years post-incarceration," and about 21% probability that Anderson would engage in recidivist acts in the next 10 years.

[¶ 38] The diagnosis of a sexual disorder is not required under section 25–03.3–01(8), N.D.C.C. The individual satisfies a portion of this section, part (2) under *In re G.R.H.*, 2006 ND 56, ¶ 6, 711 N.W.2d 587, by being diagnosed with "a personality disorder, or other mental disorder or dysfunction." *See* N.D.C.C. § 25–03.3–01(8). Therefore, in this case the RRASOR assessment served only to eliminate one of

the possible congenital or acquired conditions required under the statute.

2

[¶ 39] Under the MnSOST–R, Anderson's score of 14 correlates to a 78% likelihood of committing another chargeable sexual offense in the next 6 years. Dr. Etherington characterized this score as "corresponding to the highest-risk range assessed by this scale."

3

[¶ 40] Under the Static–99, Anderson scored a 5 on a scale of 11 or 12; however, Dr. Belanger testified that "the highest known score achieved in reality is about a seven." This test measures both paraphilia and antisocial personality disorder; therefore, "the strong loading on the antisocial factor is washed out to a degree by the low loading on the paraphilic factor," according to Dr. Belanger. According to Drs. Etherington and Belanger, even with this mitigation, Anderson's score translates to a 38 to 40 percent probability of recidivism over the next 15 years.

4

[¶ 41] Under the PCL–R 2nd, Dr. Etherington concluded:

His PCL–R score of 37–39 falls well above the threshold score of 25+ for a finding of a *high degree of psychopathy*, however, he was not diagnosed with a sexual disorder. It is therefore concluded that this high-risk combination does not affect Mr. Anderson's sexual recidivism risk. The high score on this measure, however, does support a belief that *Mr. Anderson has a more severe antisocial personality than the general prison population.*

(Emphasis added.) Dr. Belanger explained the importance of the PCL–R 2nd assessment:

The PCL–R 2nd scores are important in two different ways. First, it provides test *corroboration to the clinical diagnosis* of antisocial personality disorder. Second, the detail scores ... are well within the range of scores that are associated with diminished response modulation. [footnote omitted] Thus the PCL–R 2nd scores also provide a basis for the opinion that *Mr. Anderson is likely to engage because of a deficit in volitional capacity sufficient to create serious difficulty in the exercise of self-control.*

(Emphasis added.)

D

[¶ 42] All three experts concluded that Anderson has engaged in sexually predatory conduct, each noting the significance of the 1998 gross sexual imposition charge and the 2000 conviction for corruption of a minor. All three experts found Anderson to have a "severe" or "significant" antisocial personality disorder. All three experts found the required nexis or "causative connection" between Anderson's personality disorder and his dangerousness by noting his impulse-control problems as evidenced by the 1998 and 2000 incidents as well as the many fights and "write-ups" he has had while incarcerated. Drs. Etherington and Gulkin stressed the significance of Anderson's failure to complete sex offender treatment. All three experts concluded Anderson is a sexually dangerous individual and recommended involuntary civil commitment. All three experts relied on the combination of clinical interviews, actuarial testing, and a review of Anderson's record of conduct to arrive at their conclusions. In the expert opinion of three doctors, Anderson is not the typical recidivist in the ordinary criminal case.

[¶ 43] The district court's commitment order is supported by clear and convincing evidence and is not clearly erroneous.

## V

[¶ 44] We affirm the judgment of the district court.

[¶ 45] GERALD W. VANDE WALLE, C.J., and DANIEL J. CROTHERS, MARY MUEHLEN MARING, JJ., concur.

KAPSNER, Justice, dissenting.

[¶ 46] I respectfully dissent. On this record, civil commitment is nothing more than a mechanism for general deterrence.

## I

[¶ 47] To involuntarily commit an individual under our statute, there must be a finding the individual has engaged in sexually predatory conduct and is diagnosable with a personality, sexual, or mental disorder that makes the individual "likely to engage in further acts of sexually predatory conduct which constitute a danger to the physical or mental health or safety of others." N.D.C.C. § 25–03.3–01(8). This Court has said "likely to engage in further acts of sexually predatory conduct" means the individual's "propensity towards sexual violence is of such a degree as to pose a threat to others." *Matter of G.R.H.*, 2006 ND 56, ¶ 16, 711 N.W.2d 587. Our statute must be read in light of the due process requirements enunciated in *Kansas v. Crane*, 534 U.S. 407, 122 S.Ct. 867, 151 L.Ed.2d 856 (2002). *G.R.H.*, 2006 ND 56, ¶ 18, 711 N.W.2d 587. The individual must have a serious difficulty in controlling behavior. *Crane*, 534 U.S. at 413, 122 S.Ct. 867; *see also G.R.H.*, at ¶ 18. To justify commitment, this difficulty must be severe enough to distinguish a sex offender from other dangerous, but typical, recidivists. *Crane*, 534 U.S. at 412–13, 122 S.Ct. 867; *see also G.R.H.*, at ¶ 18. Otherwise, civil commitment quickly becomes a " 'mechanism for retribution or general deterrence'—functions properly those of crimi-

nal law, not civil commitment." *Crane*, 534 U.S. at 412, 122 S.Ct. 867 (citing *Kansas v. Hendricks*, 521 U.S. 346, 372–73, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (Kennedy, J., concurring)). Therefore, before an individual can be civilly committed as a sexually dangerous individual, there must be a showing: (1) of prior sexually predatory conduct; (2) of some type of congenital or acquired condition manifested by a personality, sexual, or mental disorder; (3) that the condition makes the individual "likely to engage in further acts of sexually predatory conduct" meaning the individual's propensity towards sexual violence is of such a degree as to pose a threat to others; and (4) that the individual must have a serious difficulty in controlling behavior.

[¶ 48] Other jurisdictions interpreting *Crane* have concluded merely being diagnosed with antisocial personality disorder is insufficient to civilly commit an individual. As I wrote in *G.R.H.*, a diagnosis of antisocial personality disorder is not uncommon in individuals who have been in prison. 2006 ND 56, ¶ 40, 711 N.W.2d 587 (Kapsner, J., dissenting). "Approximately 40–60% of the male prison population are diagnosable with antisocial personality disorder." *Id.* (citing *Crane*, 534 U.S. at 412, 122 S.Ct. 867; Moran, *The Epidemiology of Antisocial Personality Disorder*, 24 Social Psychiatry & Psychiatric Epidemiology 231, 234 (1999)). In *G.R.H.*, Dr. Etherington testified that those percentages were actually much higher. *G.R.H.*, at ¶ 40 (Kapsner, J., dissenting). In *G.R.H.*, Dr. Etherington "testified that approximately 60%–75% of incarcerated individuals suffered from antisocial personality disorder." *Id.* (Kapsner, J., dissenting). One jurisdiction held:

> Under United States Supreme Court case law, a state cannot constitutionally confine a person solely based on antiso-

cial behavior. In order to civilly commit an individual, there must be at least clear and convincing evidence that the individual is "mentally ill" and "dangerous."

*In re Doe,* 102 Hawai'i 528, 78 P.3d 341, 361–62 (Ct.App.2003); *accord Foucha v. Louisiana,* 504 U.S. 71, 82, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (disapproving of civil commitments based solely on antisocial personality diagnosis). It is imperative to note Anderson was not diagnosed with any sexual disorder. His only disorder for purposes of this commitment is having an antisocial personality.

[¶ 49] The majority, at ¶ 22, acknowledges the *Crane* requirements, but fails to adequately explain how the record establishes Anderson's antisocial personality disorder distinguishes him from other dangerous, but typical, recidivists. Instead, the majority relies on a cursory conclusion derived from Dr. Etherington's analysis of the PCL–R 2nd, which supports "a belief that Mr. Anderson has a more severe antisocial personality than the general prison population." Majority, at ¶ 41 (emphasis omitted). The majority also summarily concludes: "In the expert opinion of three doctors, Anderson is not the typical recidivist in the ordinary criminal case." Majority, at ¶ 42. The majority's statement is unsupported by the record. Dr. Etherington's position, that Anderson's disorder is more severe than the general prison population, cannot be contorted to mean Anderson's behavioral issues are somehow more dangerous than other dangerous, but typical, recidivists. Dr. Belanger concludes Anderson has a severe antisocial personality disorder, and that his disorder renders him likely to engage in additional acts of sexually predatory conduct. Dr. Gulkin concludes Anderson's "general sexual adjustment is problematic and his poor judgement/impulse control puts him at risk

for further acts of sexually predatory behavior in unsupervised situations."

[¶ 50] Dr. Etherington's belief that Anderson's disorder is more severe than the general prison population is not the standard pronounced in *Crane,* 534 U.S. at 413, 122 S.Ct. 867, or in *G.R.H.,* 2006 ND 56, ¶ 18, 711 N.W.2d 587. There must be more than an acknowledgment that Anderson has a more severe antisocial personality than the general prison population. *See Crane,* at 413, 122 S.Ct. 867; *G.R.H.,* at ¶ 18. Without this standard, nothing prevents the State from using civil commitment as a " 'mechanism for retribution or general deterrence,' " which is constitutionally impermissible. *Crane,* 534 U.S. at 412, 122 S.Ct. 867.

[¶ 51] Meeting the *Crane* standard is questionable given Anderson's criminal history. Anderson's first sexually-related criminal charge, occurring when he was seventeen, involved violence and force, although it was sentenced as a class B misdemeanor. His only other conviction for sexual conduct was a conviction of a class A misdemeanor, corruption of a minor, for engaging in sex with his sixteen-year-old girlfriend when he was twenty years old. It is acknowledged that this sex was consensual and criminal only because of the age of the female. The majority glosses over this fact and states that the later conviction "did not figure greatly into the psychological evaluations," an astonishing statement in light of the *Crane* criteria. While clearly criminal conduct under our law, and one for which he has been appropriately criminally punished, this is not the type of crime that one ordinarily thinks of when contemplating the civil commitment of sexual predators. A twenty-year-old man having consensual sex with a sixteen-year-old girl may be criminal by virtue of her age, but in the absence of such a

statute, could not even be considered an unusual occurrence.

[¶ 52] All three experts agreed Anderson has not been diagnosed with any sexual disorder. The trial court found: "Paraphilia is arousal through socially unacceptable sexual practices such as pedophilia or sadism and Anderson does not display abnormal sexual arousal patterns that rise to the level of a paraphilia." However, Anderson has an antisocial personality disorder characterized by impulsivity and irritability. Therefore, the logic goes, his next criminal act *might* include sexual misconduct. Anderson does have trouble with self-control as evidenced by his past criminal history and by the numerous altercations while incarcerated. This seems to be the bottom line of the evidence supporting his commitment, not that he is a *sexually* dangerous individual but that he is generally unable to control his behavior. As a result, he is being confined for an indefinite period of time. If his criminal history and his general behavior in the prison system are sufficient to demonstrate that it is likely he will fail again to conform to social norms, it is unnecessary to label him a "sexual predator." Our criminal justice system is prepared to deal with the repeat offender by increasingly severe criminal sanctions. What our constitutional framework is not prepared to accept, however, is that we may civilly commit Anderson in anticipation that he will probably commit such acts and speciously call him a "sexual predator" in order to do so.

[¶ 53] I do not believe, and the record does not adequately reflect, that Anderson is more dangerous than the dangerous, but typical, recidivist. The commitment here amounts to nothing more than general deterrence.

II

[¶ 54] I reiterate my concern over the uncritical use of diagnostic tools and assessment tests on sex offenders. *See Interest of P.F.*, 2006 ND 82, ¶¶ 26–30, 712 N.W.2d 610 (Kapsner, J., concurring). These tests and assessments are not substitutes for judicial decision-making or review. *Id.* at ¶ 29. Instead, their proper function in the civil commitment proceedings should be considered one factor to be weighed in determining whether an individual is likely to engage in further acts of sexually predatory conduct.

[¶ 55] In civil commitments, courts are asked to strike a delicate balance between protecting society from sexual violence and depriving an individual of his constitutionally guaranteed freedoms. This difficult position was noted by Eric Janus and Paul Meehl, who said:

> If predictions about future violence are too optimistic, sexual violence may result. Unduly pessimistic predictions result in unnecessary, prolonged deprivations of liberty. In addition, sex offender commitments entail treatment that is expensive and intrusive, while sexual violence is exceedingly destructive. Thus, both types of prediction errors are costly in many ways.

Eric S. Janus & Paul E. Meehl, *Assessing the Legal Standard for Predictions of Dangerousness in Sex Offender Commitment Proceedings*, 3 Psychol. Pub. Pol'y & L. 33, 35 (1997) (footnotes omitted). Those concerns have been echoed through numerous articles. *See, e.g.,* Eric S. Janus, *Closing Pandora's Box: Sexual Predators and the Politics of Sexual Violence,* 34 Seton Hall L.Rev. 1233 (2004) (discussing constitutional implications of sexual predator commitment laws); John Q. La Fond, *The Future of Involuntary Civil Commitment in the U.S.A. after Kansas v. Hendricks,* 18 Behav. Sci. & L. 153, 165 (2000)

(noting sexual offender civil commitment statutes might bring about "the collapse of substantive due process" and lead state legislatures down a "slippery slope," where the "next 'crime of the month'" might justify civil commitment).

[¶ 56] To assist clinicians with making the "dangerousness" prediction, researchers have created actuarial risk assessments to help predict recidivism. These actuarial risk assessments are statistical models, which involve documenting "the existence of a statistical correlation between the presence of certain 'risk factors' and a particular outcome." Fred S. Berlin et al., *The Use of Actuarials at Civil Commitment Hearings to Predict the Likelihood of Future Sexual Violence,* 15 Sexual Abuse: J. Res. & Treatment 377, 377 (2003). In this case, as the majority discussed, psychometric " 'risk assessment inventories' or RAIs were also used to determine the probability or actuarial risk that Anderson will engage in future sexually predatory conduct[.]" Majority, at ¶ 35. Specifically, three actuarial RAIs were performed: (1) the Rapid Risk Assessment for Sexual Offender Recidivism ("RRASOR"); (2) the Static–99; and (3) the Minnesota Sex Offender Screening Tool–Revised ("MnSOST–R"). A psychologist also performed the Psychotherapy Checklist–Revised ("PCL–R 2nd") on Anderson, which attempts to measure "psychopathy," which it defines as a combination of interpersonal patterns, emotional characteristics, and behavioral tendencies. *See* Majority, at ¶ 35. I am concerned the majority's opinion might erroneously be read to imply these assessments can replace independent judicial decision-making and review. RAIs cannot and should not be used in that fashion.

[¶ 57] There is an ongoing debate in academic circles about the use of actuarial tests such as the RRASOR, Static–99, and MnSOST–R in civil commitment proceedings of sexually dangerous individuals. *See, e.g.,* Eric S. Janus & Robert A. Prentky, *Forensic Use of Actuarial Risk Assessment with Sex Offenders: Accuracy, Admissibility and Accountability,* 40 Am.Crim. L.Rev. 1443 (2003); *see also* Niklas Långström, *Accuracy of Actuarial Procedures for Assessment of Sexual Offender Recidivism Risk May Vary Across Ethnicity,* 16 Sexual Abuse: J. Res. & Treatment 107 (2004); Richard Wollert, *Additional Flaws in the Minnesota Sex Offender Screening Tool—Revised: A Response to Doren and Dow (2002),* Vol. 2, No. 4 J. Threat Assessment 65 (2003); Dennis M. Doren & Edward A. Dow, *What "Shrinkage" of the MnSOST–R? A Response to Wollert (2002b),* Vol. 2, No. 4 J. Threat Assessment 49 (2003); Richard Wollert, *The Importance of Cross–Validation in Actuarial Test Construction: Shrinkage in the Risk Estimates for the Minnesota Sex Offender Screening Tool—Revised,* Vol. 2, No. 1 J. Threat Assessment 87 (2002); Richard Wollert, *An Analysis of the Argument That Clinicians Under–Predict Sexual Violence in Civil Commitment Cases,* 19 Behav. Sci. & L. 171 (2001); Dennis M. Doren, *Recidivism Base Rates, Predictions of Sex Offender Recidivism, and the "Sexual Predator" Commitment Laws,* 16 Behav. Sci. & L. 97 (1998). Before discussing the proper use of actuarial assessments in civil commitments for sexually dangerous individuals, it is necessary to discuss what each RAI is and what each was designed to predict.

A

[¶ 58] The RRASOR was developed in 1997 by R. Karl Hanson, a researcher for the Department of the Solicitor General of Canada. The RRASOR was designed to "predict sex offense recidivism using a

small number of easily scored variables." R. Karl Hanson & David Thornton, *Improving Risk Assessments for Sex Offenders: A Comparison of Three Actuarial Scales*, 24 Law & Hum. Behav. 119, 120 (2000). The RRASOR measures four static variables that, according to Hanson and Thornton, correlated well to observed rates of recidivism. *Id.* The RRASOR factors include: (1) the subject's prior sex offenses, (2) whether there were any unrelated victims, (3) whether any victims were male, and (4) whether the subject was less than 25 years old. *See id.* at 121.

[¶ 59]  Due to the relative ease in scoring, the RRASOR has been widely used as a screening tool. Subsequent research by the RRASOR's author, Hanson, and another researcher, Monique Bussière, indicated the RRASOR can be accurate in predicting future sexual violence. *See* R. Karl Hanson & Monique T. Bussière, *Predicting Relapse: A Meta–Analysis of Sexual Offender Recidivism Studies*, 66 J. Consulting & Clinical Psychol. 348 (1998). Further research by other psychologists has validated the RRASOR. *See* Berlin et al., *supra*, 15 Sexual Abuse: J. Res. & Treatment at 378 (discussing earlier research on the RRASOR). Other researchers have warned the RRASOR, like all actuarial assessments, is based on certain assumptions, and depending on the validity of those assumptions, the likelihood that a particular offender will commit future sexual violence may or may not be correct. *Id.; see also* Doren, *supra*, 16 Behav. Sci. & L. 97. Some have concluded the RRASOR has little practical import in the civil commitment context. Berlin et al., *supra*, 15 Sexual Abuse: J. Res. & Treatment at 378. According to Berlin, researchers developing the MnSOST–R found that "[n]inety-eight percent of what had determined whether or not persons were likely to recidivate [had] to do with factors other than those that had been assessed by the

RRASOR.... Thus, although the RRASOR achieved statistical significance, it may not have had much practical significance." *Id.* at 379.

## B

[¶ 60]  The Static–99, the most recent actuarial development, is a ten-item assessment developed by R. Karl Hanson and David Thornton. It rates an individual based on (1) the number of prior sex offenses; (2) the number of prior sentencing dates; (3) any convictions for non-contact sex offenses; (4) index case nonsexual violence; (5) prior nonsexual violence; (6) any unrelated victims; (7) any stranger victims; (8) any male victims; (9) current age of the offender; and (10) whether the individual is single. Berlin et al., *supra*, 15 Sexual Abuse: J. Res. & Treatment at 380. Since Hanson also developed the RRASOR, all four RRASOR factors are subsumed into the Static–99. *See id.* A "score of 6 or more is considered to be reflective of a 'high risk of sexual recidivism.'" *Id.* The statistical tables reporting Hanson and Thornton's follow-up data indicated the higher an individual's Static–99 score, the higher percentage of individuals who eventually recidivated. *See id.* Therefore, the Static–99, like most actuarial risk assessments, can work effectively as an initial "screening tool that can identify a group of individuals ..., who when considered as a group, are at heightened risk [to recidivate]." *Id.* When offenders are considered individually, however, "the Static–99 cannot do much better than a coin flip." *Id.* at 381.

## C

[¶ 61]  The MnSOST–R was developed for the Minnesota Department of Corrections to predict sexual recidivism in rapists and extrafamilial child molesters. Hanson & Thornton, *supra*, 24 Law & Hum. Be-

hav. at 120. It measures sixteen variables, "addressing sexual and nonsexual criminal history, the victim's age and relationship to the offender, substance abuse, unstable employment, age, and treatment history." *Id.* The MnSOST–R considers both static and dynamic variables for recidivism. From the sixteen variables, the individual receives a "dangerousness" score from 1 to 10. "In practice, a MNSOST–R score of 8 or higher is often considered suggestive of a 'high risk' of recidivism." Berlin et al., *supra,* 15 Sexual Abuse: J. Res. & Treatment at 380.

[¶ 62] There has been a significant academic discussion about the likelihood of recidivism based on the MnSOST–R. Specifically, "the MnSOST–R ... has not yet been fully cross-validated." Terence W. Campbell, *Assessing Sex Offenders: Problems and Pitfalls* 98 (2004). Some researchers have noted the assessment's results have been "greatly inflated," *see* Berlin et al., *supra,* 15 Sexual Abuse: J. Res. & Treatment at 380 (citing Wollert, *supra,* Vol. 2, No. 1 J. Threat Assessment 87), while others support the predictive qualities of the MnSOST–R because it attempted to narrow its predictive accuracy. *See* Doren & Dow, *supra,* Vol. 2, No. 4 J. Threat Assessment 49. One researcher suggested "that use of the MnSOST–R be suspended at least until its performance estimates can be confirmed by proper cross-validation studies, in large samples, with naturally occurring and 'middle-of-the-road' recidivism rates." Campbell, *supra,* at 104–05 (quotations omitted). Even MnSOST–R supporters noted:

> Further research is needed before the extent to which the MnSOST–R generalizes to diverse samples is known. Both the MnSOST and MnSOST–R were constructed from preestablished groups of recidivists and nonrecidivists, which makes it difficult to directly translate the scores into recidivism rates.

*Id.* at 105 (quoting R. Karl Hanson, *Who is Dangerous and When are They Safe: Risk Assessment with Sexual Offenders,* printed in *Protecting Society from Sexually Dangerous Offenders* 69 (B.J. Winick & John Q. La Fond, eds., 2003)).

### D

[¶ 63] The PCL–R 2nd is a supplementary assessment tool to measure an individual's "psychopathy." The original PCL–R was developed by Robert Hare in 1985. Campbell, *supra,* at 134. The PCL–R 2nd, developed in 2003, is "essentially the same instrument except for some minor changes." *Id.* at 135. Conventional scoring of the PCL–R [and PCL–R 2nd] requires specialized training, file review, and a lengthy guided interview. Howard E. Barbaree et al., *Evaluating the Predictive Accuracy of Six Risk Assessment Instruments for Adult Sex Offenders,* 28 Crim. Just. & Behav. 490, 514 (2001) (discussing scoring of the PCL–R). Data used in this tool is obtained via an interview and review of the relevant file data. Campbell, *supra,* at 135. In developing the PCL–R 2nd, Hare commented "[a]mong offenders the PCL–R tends to be strongly associated with general and violent criminality, but only weakly or inconsistently with the number of convictions or charges for sexual offenses." Robert D. Hare, *The Hare Psychopathy Checklist–Revised–2nd Edition: Manual* 138 (2003). Relying on Hare's comments and independent research conducted on the PCL–R, some commentators have indicated the PCL–R or the PCL–R 2nd does "not successfully predict sexual recidivism." Campbell, *supra,* at 137; Barbaree et al., *supra,* 28 Crim. Just. & Behav. at 514.

### III

[¶ 64] As the researchers studying and developing these RAIs have noted, each of

the tools has limitations. These actuarial assessments rely on aggregate or group data. *See* Janus & Prentky, *supra*, 40 Am.Crim. L.Rev. at 1476. Which means they "tell[ ] us the empirically measured rate of recidivism among a group of sex offenders who share a set of characteristics with the subject of the evaluation." *Id.* The RAIs do not predict the likelihood of individual recidivism and thus tell us nothing about the likelihood that a particular person who shares the set of characteristics will reoffend. *See id.* As Justice Coyne of the Minnesota Supreme Court succinctly stated:

> Not only are the statistics concerning the violent behavior of others irrelevant, but it seems to me wrong to confine any person on the basis not of that person's own prior conduct but on the basis of statistical evidence regarding the behavior of other people.

*Matter of Linehan,* 518 N.W.2d 609, 616 (Minn.1994) (Coyne, J., dissenting). Because the actuarial assessments rely solely on aggregate data, they have no probative value in determining whether a particular individual is likely to reoffend.

[¶ 65]   Our civil commitment statute requires a determination that the individual's propensity towards sexual violence is of such a degree as to pose a threat to others. This is, in part, why the RAIs have become so important as a starting point in the analysis of the commitment procedures for persons who have committed a sexual offense. They are a fairly mechanical tool that will identify a group of convicted persons who should be evaluated for consideration to be civilly committed. N.D.C.C.

§ 25–03.3–03.1. However, even when it is thoroughly understood that the RAIs do not assess the likelihood of the individual to reoffend, rather the likelihood of a group of people possessing similar characteristics to reoffend, the tools do not assess the imminence of the statistical reoffense in any meaningful way.

[¶ 66]   In Anderson's case, the mental health professionals do not appear to be concerned with imminence whatsoever. Dr. Belanger testified:

> My job, as I understand it, is to make an estimation of the risk of one or more acts of recidivist sexually predatory conduct over a *lifetime.* Not to make an estimation of apprehension or conviction but to make an estimation of the risk of one or more act of recidivist sexual predatory conduct over a *lifetime* and I'm to do this on the basis of my training and experience. This is good, strong, nomothetic evidence to the fact that when I say likely to engage that's got numbers behind it.

(Emphasis added).   It is a judicial function, not a psychological function, to decide whether measuring a statistical likelihood to sexually reoffend over a lifetime is evidence, clear and convincing, to justify the deprivation of an individual's liberty.[1] Such evidence does not exist in this record.

## IV

[¶ 67]   Each of the tests discussed in Part III indicated Anderson exhibited some likelihood to reoffend. Majority, at ¶ 37 (indicating that under the RRASOR, Anderson had a 14.2% likelihood of being

---

1.   One commentator has stated we should not be devoting extraordinary resources to the ordinarily dangerous, and we should not be civilly committing individuals based on this speculative assessment of non-imminent occurrences. However, that is a legislative policy matter, not a judicial matter. *See* Eric S.

Janus, *Minnesota's Sex Offender Commitment Program: Would an Empirically–Based Prevention Policy Be More Effective?* 29 Wm. Mitchell L.Rev. 1083, 1101 (2003) (noting that commitments in Minnesota cost about $20 million per annum, and will increase more than three-fold by 2010).

reconvicted for a new sexual offense within 5 years and about a 21% probability that he would engage in recidivist acts in the next 10 years); Majority, at ¶ 39 (stating that under the MnSOST–R, Anderson's score correlates to a 78% likelihood of committing another chargeable sexual offense in the next 6 years); Majority, at ¶ 40 (indicating that under the Static–99, Anderson had a 38–40% probability of recidivism over the next 15 years); and Majority, at ¶ 41 (noting Anderson's PCL–R score was well above the threshold for finding a high degree of psychopathy, which supports a belief that Anderson's antisocial personality is more severe than others in the general prison population). These actuarial tests were never designed to predict individual recidivism. Janus & Prentky, *supra*, 40 Am.Crim. L.Rev. at 1476–77. Although Anderson shares some characteristics of a group of people who have a likelihood to reoffend, importing the results to Anderson individually is seriously misleading.

[¶ 68] Notwithstanding Anderson's scores on the various diagnostic tools and actuarial assessments, we have previously made clear that we will not engage in a "contest over percentage points" when it comes to determining whether an individual meets the requirements for civil commitment. *Interest of M.B.K.*, 2002 ND 25, ¶ 18, 639 N.W.2d 473. Instead, we require a thorough examination by experts to make the initial recommendation of whether an individual poses a threat to society. *Id.* A certain test score on the RRASOR or Static–99 does not make an individual automatically committable. If we were to accept such logic, the judiciary would be without purpose. The court has the ultimate decision to determine whether the State has met its burden of producing clear and convincing evidence sufficient for commitment. A psychological test cannot act as a substitute for independent judicial review.

V

[¶ 69] Aside from depriving an individual of his life, taking his liberty is the most intrusive invasion of the government into a person's life. Civil commitment is such an invasion. And it is an invasion for an indefinite period of time. Based upon this record, I cannot distinguish Anderson's commitment from a mechanism for general deterrence which, *Kansas v. Crane* and *Kansas v. Hendricks* advise, is properly the function of the criminal, not the civil, law. Therefore, I dissent.

[¶ 70] Carol Ronning Kapsner